UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **CRIMINAL NO. 2:22-cr-00132-NT** |
| | ) | |
| MERIDETH C. NORRIS, D.O. | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

**NOW COMES** the Defendant, Dr. Merideth Norris, by and through Undersigned Counsel, and submits this Memorandum in aid of his sentencing.

## I.    INTRODUCTION

This Court's job is undoubtedly difficult.  Counsel suspects that the Court will agree that there is no specific deterrence needed here.  Dr. Norris needs no punishment to be taught to be a good person.  To the contrary, she is a shining light of charity and benevolence in a world that needs this more than ever.

The Court's job is difficult because there will undoubtedly be general deterrence arguments that the Court will hear from the Government.  The Undersigned submits that any general deterrence arguments are so substantially outweighed by Dr. Norris' extraordinary and charitable life that a traditional custodial sentence is unwarranted.

## BACKGROUND

"The meaning of life is to find your gift. The purpose of life is to give it away."
—Pablo Picasso

Before this Court stands Dr. Merideth Catherine Norris—a woman whose life's work has been characterized by extraordinary service to others, often at great personal risk and sacrifice. Dr. Norris is not only a physician by title, but a healer by calling. She dedicated her career to serving some of the most marginalized and vulnerable members of our society—individuals suffering from addiction, chronic pain, mental illness, and poverty—those often ignored or rejected by the broader medical establishment. She chose to practice medicine where others would not, to treat patients others turned away, and to provide care when it was hardest to give.

Born in Winchester, Massachusetts in 1970, Dr. Norris demonstrated from an early age a brilliant mind and a compassionate heart. Graduating high school at the age of 16, she pursued higher education with vigor, obtaining a degree in psychology and anthropology from Wellesley College, followed by a Doctor of Osteopathy from Nova Southeastern University. While her intellect could have led her to any number of prestigious and lucrative opportunities, Dr. Norris chose a different path—one rooted in service.

From the start, Dr. Norris was drawn to areas of need rather than areas of comfort. After completing her medical training, she began her career in rural communities, providing full-spectrum care in regions long overlooked by the healthcare system. She later settled in Maine, where she spent over a decade

building a practice grounded in the treatment of individuals as a primary care provider and in the treatment of those struggling with poverty, substance use disorders, chronic pain, mental health issues, and co-occurring conditions of the same. These were patients who often had nowhere else to go—patients for whom Dr. Norris was their last, and sometimes only, lifeline.

Her work was not without risk. Practicing addiction and chronic pain medicine, especially during the height of the opioid crisis, placed her in a uniquely vulnerable position—subject to legal scrutiny, public stigma, and immense emotional burden. Yet, Dr. Norris persisted, not for recognition, but because she believed deeply in the humanity of her patients. She saw beyond their conditions to the people they were and the lives they could reclaim with support and dignity.

As one of her colleagues, Dr. Kathryn Brandt, put it: "Of all the many physicians and leaders I know and from whom I have learned in the past nearly 30 years, no one exemplifies the pledge to provide compassionate, quality care to patients more than Dr. Norris. She has been the teller of inconvenient truths, holding all of us accountable to see the humanity in stigmatized patient populations and address the underlying causes of the most complex issues."

Dr. Norris's commitment to service extended beyond her medical practice. She was an active leader in her church, a regular volunteer at each of her three children's schools and activities, a provider of free medical care/physicals at community events, a mentor to young physicians, and a vigorous and tireless advocate for social justice. She led community health initiatives, educated others on

the challenges of addiction and chronic pain and treatment of the same, and volunteered her time to countless causes aimed at uplifting the lives of others. During the COVID-19 pandemic, she not only supported healthcare workers but guided her community in creating safety protocols, offering both medical and emotional support when it was most needed.

Her dedication was not confined to a clinical setting. As one community member noted: "Every night during the COVID lockdown, Merideth led a group of neighbors in going outside at 7:00 PM to yell or to bang something to show support for healthcare workers. She was out there every single night. I believe that shows how caring and thoughtful a person she is.  This world needs more people like that."

Dr. Norris's role as a physician was never about self-interest—it was about filling a void in the healthcare system for those who were otherwise forgotten. She accepted patients who had been rejected elsewhere, including those with complicated medical histories, limited financial means, or legal issues stemming from addiction. While many physicians distanced themselves from this high-risk field, Dr. Norris embraced it, knowing that her skills, compassion, and unwavering commitment could make a real difference. Other physicians referred their most complicated patients to Dr. Norris and as more and more doctors retired or left medical practice in her community she was left to care for so many who otherwise would not have access to medical care.

Her patients, many of whom wrote letters to this Court, describe her as "a lifeline," "the only one who listened," and "a doctor who truly saved lives." One

former patient recounted: "Merideth Norris is not only studied, she worked diligently for a number of years in her life to achieve licensure. I cannot imagine the studies one takes on to become an established physician. Meredith Norris is one of the finest. She is undoubtedly beloved and her care is needed by numerous individuals who are lost, especially with how the world is today."

As another colleague, Dr. Tamara Chin, emphasized: "She is one of society's safety nets, and from my experience in the Emergency Department, I am certain she prevents people from dying on a daily basis. Removing her from her role would have a long-lasting negative impact on our community."

Dr. Norris's choice to serve such a vulnerable population came with tremendous challenges. She faced systemic barriers, professional isolation, and increasing legal risks as regulatory environments shifted. But despite the toll, she continued to advocate fiercely for her patients, striving to provide them not only with medical treatment but with hope. Dr. Norris answered her phone to her patients at all hours of the day and night and treated them with the dignity we all deserve regardless of the illness suffered or social or economic status. Since the day Dr. Norris was unexpectedly arrested, her overwhelming concern has been who will help her patients struggling with chronic pain and/or addiction.

Her dedication was deeply personal. Dr. Norris has long battled health issues herself, including lupus, hypertension, and mental health challenges. Yet, she remained present and engaged, balancing her medical responsibilities with the demands of raising three wonderful children, including one with autism, for whom

she is the legal guardian. She is also a steadfast partner to her husband and a pillar of her local community.

Now, with an inability to secure medical malpractice insurance and her practice shuttered, Dr. Norris's absence is acutely felt. The underserved patients she cared for, the colleagues she supported, and the community she enriched are left without her steady hand and open heart. The 143 (and still being received) character letters submitted to this Court reflect a rare consensus: Dr. Norris is a person of profound moral character, whose life has been a testament to service, compassion, and self-sacrifice. She is not defined by her conviction but by the years she spent standing with those no one else would.

Her story is not one of privilege or self-interest, but of courage—of a woman who chose the harder path because she believed it was right. A custodial sentence would not only sever her from those she still seeks to help but would deprive society of one of its few willing to walk with the most vulnerable among us.

This is the individual before the Court. A healer. A mother. A servant leader. A woman whose life has been shaped by an unrelenting commitment to care for others when few would. She asks not for absolution, but for the opportunity to continue serving in whatever way she can, and to allow her to continue to be there in both person and heart for her children.

## III.    SENTENCING ARGUMENT

    *A.    Overview of the Sentencing Process*

Both the Supreme Court and the First Circuit have outlined the sentencing process. *U.S. v. Gall*, 128 S. Ct. 586 (2007); *U.S. v. Martin*, 520 F.3d 87, 91 (1st Cir. 2008). The Court begins its analysis with the calculation of the advisory sentencing range, and considers the appropriateness of any recognized Guidelines departures. *Martin* at 91. The Court then weighs the arguments of the parties regarding the case and defendant specific facts in light of the factors put forth in 18 U.S.C. § 3553(a).

After a case-specific analysis of those factors, the sentencing court has broad discretion to deviate from the Guidelines, and there is great deference accorded to its decision. *Gall*, 128 S. Ct. 586 (2007); *United States v. Iannarelli*, 524 F.3d 286, 292 (1st Cir. 2008); see also *United States v. Taylor*, 523 F.3d 68; *Martin*, 520 F.3d at 98. Once the Guideline Sentencing Range has been calculated, "sentencing becomes a judgment call" for the court, and the court may construct a sentence varying from the Guideline Range "based on a complex set of factors whose interplay and precise weight cannot even be precisely described." *Iannarelli*, 524 F.3d at 292 (quoting *Martin*, 520 F.3d at 92). "Ultimately, '[t]here is no single reasonable sentence in any particular case, but, rather, a universe of reasonable outcomes," *U.S. v. Prosperi*, 686 F.3d 32, 43 (1st Cir., July 13, 2012) (quoting *United States v. Walker*, 665 F.3d 212, 234 (1st Cir. 2011)).

Indeed, the guidelines merely provide a "rough approximation" of an appropriate sentence. *Rita v. United States*, 551 U.S. 338, 350 (2007). Ultimately, this Court must make an independent determination as to the appropriate

sentence, taking into account the types of sentences available, the relevant §3553(a) factors, and the arguments of the parties. *See Gall v. United States*, 552 U.S. 38, 49-50 (2007).  The Court must then explain the chosen sentence in order to promote the perception of fair sentencing and to allow an appellate court a meaningful opportunity to review the record. *Id.* at 50.

B.     *Guideline Calculations*

Following are the Guideline Calculations for the convictions here.

| Guideline Provision | Description | Offense Level |
|---|---|---|
| USSG §2D1.1 | Base Offense Level | 12 |
| USSG §3B1.3 | Special Skill Enhancement | +2 |
| | Adjusted Offense Level | 14 |
| | Zero-Point Offender | -2 |
| | Total Offense Level | 12 |
| | Criminal History Category I | |

A level 12 sentence is Zone C of the Sentencing Table.   If a Guideline Sentence is imposed, the Court has a variety of options for the ultimate sentence, including the imposition of probation as a variant sentence.

C.     *The Application of §3553(a)*

In sentencing Dr. Merideth Norris, this Court is tasked with applying the principles of 18 U.S.C. § 3553(a): to impose a sentence that is "sufficient, but not greater than necessary" to serve the ends of justice. This case does not present a story of greed or disregard for human life—it presents a story of a physician who

answered society's call to serve the most vulnerable, and who now stands convicted in part for being one of the few who did.

A custodial sentence would not only be greater than necessary—it would extinguish the life's work of a woman whose only crime was trying to help too many, for too long, with too little.

> i. *The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant*

Dr. Norris's conviction arises from her prescribing of controlled substances to five patients while treating pain and addiction in a uniquely high-risk population. The jury found that some of her prescribing crossed the line into criminal conduct, but the context is critical. Unlike pill-mill operators motivated by profit or disregard, Dr. Norris was a board-certified addiction and family medicine specialist who dedicated her career to helping patients other providers had rejected.

She was, for years, one of the only physicians in southern Maine willing to treat patients with overlapping pain and addiction diagnoses. She served as Medical Director for multiple methadone clinics, operated a private practice (Graceful Recovery) for both chronic pain and substance use disorder, and held certification in Obesity Medicine. Her caseload—at one point over 400 patients—reflected the absence of adequate resources in the region and the deference other physicians placed in her willingness to serve patients that others turned away.

Far from acting with malice, Dr. Norris's prescribing reflected her intent to help, as shown by testimony from former patients and physicians alike. Witnesses in court—including multiple patients not involved in the indictment—testified that

her care was life-changing. One described going "cold turkey" after her arrest and losing all pain management. Another shared that Dr. Norris's care restored her ability to travel and garden. U.S. District Judge Torresen allowed this testimony despite prosecution objections, recognizing its relevance in assessing Dr. Norris's intentions and patient impact.

Her background reinforces this picture. Dr. Norris is a lifelong caregiver: a mother of three, legal guardian of her autistic adult son, and primary emotional support to her family. She also lives with lupus, hypertension, PTSD, and chronic anxiety, all of which she manages while continuing trauma-informed therapy. She has no prior criminal history, is a fixture in her church community, and received formal recognition from the Maine Board of Osteopathic Licensure, which dismissed its investigation and commended her care in 2022. In September 2024, the same Board renewed Dr. Norris's medical license for another two-year term.

In fact, it is worth highlighting that the Maine Osteopathic Association has written to this Court—as an organization of osteopaths in Maine—to express their full throated support for Dr. Norris. *Defendant's Exhibit 74.* They correctly note:

> Dr. Norris has devoted her career to providing care for some of the most vulnerable populations in Maine. As a physician, she has demonstrated an unwavering commitment to addressing critical public health issues, particularly in addiction medicine, pain management, and obesity treatment.

*Id.*

They eloquently ask this Court for Mercy for Dr. Norris. In fact, they request that "given Dr. Norris's invaluable contributions, we urge you to be compassionate

in dispensing your judgement. Dr. Norris is a deeply caring advocate, mother, wife, and friend. We urge you to consider a judgement that acknowledges the long and positive role that Dr. Norris has played in the medical community providing care for those so many others shun." *Id*.

Dr. Norris is not defined by her conviction. She is defined by her two decades of compassionate, community-rooted medical service, often in spaces where few others would venture.

### ii. The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

A noncustodial sentence would achieve each of these aims. Dr. Norris has already endured devastating consequences: loss of her DEA numbers, closure of her practice, severe public scrutiny, reputational damage, and emotional distress. She faces the stigma of a felony conviction and the permanent mark it leaves on her personal and professional life. These consequences—together with the federal conviction—underscore the seriousness of her actions and promote respect for the law.

At the same time, incarceration risks sending the wrong message. As multiple physicians and patients warned, a custodial sentence for Dr. Norris would chill other providers from treating addiction and pain, compounding an already-dire shortage of care. Dr. Stefan Kertesz, a national expert in addiction medicine, emphasized the unintended fallout: "[Such prosecutions] result in deaths by suicide and overdose. How many are dead now? How many lost their doctor, deteriorated or are dead?"

11

Respect for the law is best promoted by demonstrating that the justice system can distinguish between harmful conduct and good-faith medical error in a system with shifting regulatory standards and inadequate resources.

      *iii.    The Need to Afford Adequate Deterrence 18 U.S.C. § 3553(a)(2)(B)*

General deterrence has already been served. The public prosecution, trial, and conviction of Dr. Norris—highly publicized as the first New England case brought by the DOJ's Opioid Strike Force—have undoubtedly signaled to medical professionals the seriousness of failing to adhere to prescribing standards.

Deterrence as a sentencing rationale is subject to limitation. As the First Circuit states:

> The court's duty to "individualize" the sentence simply means that, whatever the judge's thoughts as to the deterrent value of a jail sentence, he must in every case reexamine and measure that view against the relevant facts and other important goals such as the offender's rehabilitation. Having done so, the district judge must finally decide what factors, or mix of factors, carry the day.

*United States v. Foss*, 501 F.2d 522, 528 (1st Cir. 1974).

The empirical evidence is unanimous that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime. See Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects");

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

The Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines' offense level. . . . While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guideline*s, at 15 (2004) ["U.S. Sent'g Comm'n, Measuring Recidivism"]. See also Part IV.A.3, infra. And according to "the best available evidence, . . . prisons do not reduce recidivism more than

noncustodial sanctions." Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

Specific deterrence is unnecessary here. Dr. Norris has no intent to reoffend, no capacity to practice medicine in the near term and no risk of engaging in similar conduct. She gave up her DEA numbers before the trial. She remains under professional sanctions and intense public scrutiny. Her ongoing engagement in therapy and her open acknowledgment of personal and systemic challenges reflect her willingness to grow and change.

      *iv.*    *The Need to Protect the Public from Further Crimes of the Defendant*

Dr. Norris does not pose a danger to the public. She is not a trafficker, a profiteer, or a predator. She is a caregiver who stood at the crossroads of addiction and medicine, and who—right or wrong—chose to engage, to treat, to help.

Her patients did not fear her—they clung to her. Her colleagues did not question her motives—they referred their hardest cases to her. Even the Maine Board of Osteopathic Licensure reviewed her conduct and not only found no cause for discipline but *thanked her* for her work.

Removing her from society now would not protect the public. It would only deprive it of a woman whose greatest harm was trying too hard to ease the suffering of others.

Indeed, the community has spoken, in the form of *Defendant's Exhibit 1 through 143*. All are letters of support from the many members of the community who trumpet Dr. Norris good work. The public faces no danger.

v.    *The Need to Avoid Unwarranted Sentencing Disparities*

This Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentencing. "Unwarranted disparity is defined as different treatment of individual offenders who are similar in relevant ways, or similar treatment of individual offenders who differ in characteristics that are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 113 (2004).

The guideline range fails to take into account any of Dr. Norris' characteristics demonstrating that there is no need to imprison her to protect the public and that rehabilitation, to the extent that any could be needed, will be achieved in the most effective manner in the community. In this case, a substantial variance is necessary to avoid unwarranted uniformity between Dr. Norris and dissimilar defendants who committed dissimilar conduct. See *Gall*, 552 U.S. at 55 (in imposing a sentence of probation, district court appropriately "avoid[ed] unwarranted similarities").

The cases involving substantial sentences are completely unrelated to the Other physician overprescribing cases Counsel is aware of. Those cases involve intentional diversion, financial exploitation, or direct harm. Dr. Norris, by contrast, acted within a chaotic regulatory framework, with many patients referred to her by

other providers, pharmacists, or recovery centers. The stark differences in motive, setting, and conduct support a below-Guidelines sentence here to avoid disproportion.

### D.    Dr. Norris' Lack of Motive Should Be Considered

Dr. Norris is also unusual because she received no benefit from the offense conduct. This is so uncommon that Counsel struggles to find a comparable case example. Drug defendants generally have a financial incentive, a dependency they are feeding or both. Those facing white collar sentences for financial crimes often face the Court because of avarice. Each type of defendant gets something for their crimes.

Yet Dr. Norris received no benefit for her crimes. She made no significant money from her convictions. Certainly, she could have done considerably better financially in another practice specialty. She had no addiction issues and wasn't trading controlled substances on the black market, for sex, for antiques or for any number of other reasons.

What makes Dr. Norris unique is that she got nothing out of this episode. She did not benefit in any way.

Dr. Norris understands that the jury found her guilty. Regardless, she is situated differently than virtually every other defendant facing Your Honor at sentencing. Dr. Norris did not engage in the criminal conduct here for any reason other than a general desire to help an outcast patient population nobody else would treat.

E.    *The BOP Is Not Equipped to Handle an Aging Population of Inmates and Dr. Norris, Who Has Lupus, Would Not Be Well-Served In Traditional Incarceration*

In February of 2016, the Department of Justice, Office of the Inspector General (hereinafter "DOJ-OIG") submitted their revised report titled "The Impact of an Aging Inmate Population on the Federal Bureau of Prisons"[1] (hereafter "the Report"). The Report reveals that the BOP is unable to adequately care for its aging inmate population. This aging population is defined as those who are 50 years old and above. Dr. Norris is 54 years old and has Lupus

The findings of the DOJ-OIG Report also indicate that the BOP is currently unable to  provide adequate care to aging inmates. The physical infrastructure of the BOP is challenging.  A shortage of lower bunk beds and handicapped accessible cells provides one of many challenging aspects to the incarceration of aging inmates. *Report* at ii.

In short, the DOJ-OIG Report challenges the conclusion that the BOP can accomplish its mission statement as it relates to an aging inmate population.  The Report finds:

> The BOP's mission includes confining federal offenders in controlled environments that are safe, humane, cost-efficient, and appropriately secure. However, the BOP's ability to confine its aging inmate population is insufficient due to overcrowding in its institutions, as well as problems with their internal and external infrastructures. Lower bunks, essential for accommodating aging inmates with mobility limitations or medical conditions, is limited by the overcrowding of BOP institutions. As a result, institutions do not always have

---

[1] https://oig.justice.gov/reports/2015/e1505.pdf

> enough lower bunks as well as handicapped-accessible
> cells and bathrooms, and others cannot accommodate the
> number of inmates with mobility devices that require
> elevators. Further, aging inmates cannot consistently
> navigate the narrow sidewalks and uneven terrain at some
> institutions. Staff and inmates told us that separate
> housing units, or entire institutions, would be more
> appropriate to house aging inmates.

*Report*, pp. 23-24.

In February 2024, the DOJ's Office of Inspector General issued a report, "Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions". "The BOP's Response to Medical Emergencies Was Often Insufficient Due to Lack of Clear Communication, Urgency, or Proper Equipment." *Report* at ii. "We found that several staffing-related challenges may collectively hinder the BOP's efforts to mitigate inmate deaths . . . BOP staffing shortages contributed to the risk factors we identified for the inmate deaths we reviewed." *Report* at 64-65.

In October 2024, the DOJ OIG "identified serious operational deficiencies, including staffing shortages among healthcare workers and COs, substantially impacting the health, welfare, and safety of employees and inmates. Healthcare worker shortages affect daily functions such as drawing blood, triaging patients, and ensuring that medical equipment and supplies are ready for routine care and medical emergencies. Especially alarming was the backlog of 725 laboratory orders and 274 pending x-ray orders. Institution management was not always able to fill

all inmate-monitoring posts to safely supervise inmates." OIG Semiannual Report to Congress for the period from March 31, 2024, to September 30, 2024[2].

Congress has not acted to provide adequate resources to BOP. The recent enactment of the Federal Prison Oversight Act requires OIG to conduct inspections of the BOP's correctional facilities and provide recommendations to fix problems. It establishes an Ombudsman to investigate the health, safety, welfare, and rights of incarcerated people and staff. Neither the OIG nor the Ombudsman can provide or ensure adequate medical care for sick inmates. The underlying problem of inadequate staff and resources remains unaddressed.

The BOP's former director, Colette Peters, was recently removed from office; the acting director reportedly issued a hiring freeze, despite the need for additional staff. Ms. Peters later described the BOP as "rudderless.[3]" William Lathrop was named Acting Director, but he retired on February 28, 2025. Until April 12, 2025, there was no acting director. Associate Deputy Director Kathleen Toomey was the highest-ranking official at the agency.

In her recent testimony before the House of Representatives, Ms. Toomey described serious BOP staffing shortages and a $3 billion backlog of unfunded repair projects[4]. On April 12, 2025, William K. "Billy" Marshall III was appointed as Director. In 2023, Mr. Marshall was appointed to lead the troubled West Virginia Corrections Department. He has never worked at the BOP[5].

---

[2]https://oig.justice.gov/sites/default/files/semiannual-reports/SARC_April1%2C%202024-September%2030%2C%202024.pdf
[3] https://www.forbes.com/sites/walterpavlo/2025/03/28/bureau-of-prisons-is-rudderless-operation/
[4]https://docs.house.gov/meetings/AP/AP19/20250226/117920/HHRG-119-AP19-Wstate-ToomeyK-20250226.pdf
[5] https://www.themarshallproject.org/2025/04/12/billy-marshall-facts-trump-federal-prisons

## IV.    SENTENCING RECOMMENDATION

> "Tolling for the searching ones, on their speechless, seeking trail
> For the lonesome-hearted lovers with too personal a tale
> An' for each unharmful, gentle soul misplaced inside a jail
> And we gazed upon the chimes of freedom flashing"
> —Bob Dylan

Defendant proposes the following sentence, which is significant but not greater than necessary to achieve the aims of sentencing:

    i.     A sentence of 3 years of probation.

    ii.    Alternatively, a moderate sentence of house arrest, with appropriate carve outs for her to work and help her child with special needs manage their daily affairs.

Dated this 8th day of May 2025 in Portland, Maine.

Respectfully submitted,

/s/ Timothy E. Zerillo
Timothy E. Zerillo, Esq. (Bar No: 009108)
ZERILLO LAW FIRM, LLC
1250 Forest Avenue, Ste 3A
Portland, ME 04103
207-228-1139
*tim@zerillolaw.com*

*/s/* Amy L. Fairfield
Amy L. Fairfield, Esq. (Bar No: 009598)
Fairfield & Associates, P.A.
10 Stoney Brook Lane
Lyman, ME 04002
207-985-9465
*amy@fairfieldandassociates.com*

Counsel for Defendant Dr. Merideth C. Norris, D.O.

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **CRIMINAL NO. 2:22-cr-00132-NT** |
| | ) | |
| MERIDETH C. NORRIS, D.O. | ) | |

### <u>CERTIFICATE OF SERVICE</u>

I, Timothy Zerillo, hereby certify that I have caused to be served via ECF the **DEFENDANT'S SENTENCING MEMORANDUM** on all counsel of record.

Dated this 8th day of May 2025 in Portland, Maine.

Respectfully Submitted,

ZERILLO LAW FIRM, LLC

/s/ Timothy E. Zerillo, Bar No. 9108
Attorney for Dr. Merideth Norris
1250 Forest Avenue, Ste 3A
Portland, ME 04103
*tim@zerillolaw.com*